908 F.2d 740
 61 Ed. Law Rep. 1174
 UNITED STATES of America, Plaintiff-Appellee, Cross-Appellant,
v.
The BOARD OF TRUSTEES FOR the UNIVERSITY OF ALABAMA, a
public corporation, Thomas A. Bartlett, Chancellor of the
University of Alabama, and Dr. Charles A. McCallum, Jr.,
Acting President of the University of Alabama in Birmingham,
Defendants-Appellants, Cross-Appellees.
 No. 89-7148.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 8, 1990.
 
 Ina B. Leonard, University of Alabama at Birmingham, Robert L. Potts, Hattie E. Kaufman, Birmingham, Ala., for defendants-appellants, cross-appellees.
 Frank W. Donaldson, U.S. Atty., Caryl P. Privett, Asst. U.S. Atty., Birmingham, Ala., Mark L. Gross, David K. Flynn, James P. Turner, Dept. of Justice, Appellate Section, Washington, D.C., for plaintiff-appellee, cross-appellant.
 Appeals from the United States District Court for the Northern District of Alabama.
 Before CLARK, Circuit Judge, RONEY*, Senior Circuit Judge, and ATKINS**, Senior District Judge.
 CLARK, Circuit Judge:
 
 
 1
 This case requires us to determine the validity of certain portions of the regulations implementing section 504 of the Rehabilitation Act of 1973 promulgated by the Department of Health, Education and Welfare ("HEW"). The University of Alabama at Birmingham ("UAB") appeals the district court's order permanently enjoining UAB from denying auxiliary aids to handicapped students based on consideration of their financial ability, and from failing to grant auxiliary aids to handicapped "special" students and those handicapped students enrolled in the UAB Division of Special Studies. The United States cross-appeals the district court's holding that UAB has made a reasonable accommodation for the transportation of its handicapped students.
 
 BACKGROUND
 
 2
 This case was tried before the district court mostly on a stipulation of agreed facts. That stipulation, and the factual findings outlined in the district court opinion, reveal the following. At the time of trial there were approximately 175 handicapped students enrolled at UAB, of whom approximately 8 suffered a significant hearing impairment. HEW initiated an investigation in 1979 of UAB's compliance with section 504 of the Rehabilitation Act upon receipt of a complaint by a deaf student whose request for services of a sign language interpreter at UAB's expense was initially denied.
 
 
 3
 During the pendency of that investigation, UAB adopted an auxiliary aids policy. This policy states that while UAB will provide some aids, such as note-takers or transcriptions of tape recordings of classes to deaf students, UAB generally will not provide interpreters or other "costly" aids. Most of the requests for "costly" auxiliary aids at UAB have been for sign-language interpreters. Students requiring an aid such as an interpreter must notify UAB several months in advance of the academic quarter. Once notified, UAB will direct the student to seek free interpreter services provided by the state Vocational Rehabilitation Service. If the student is not eligible for assistance from the state Vocational Rehabilitation Service and cannot afford to pay for interpreter services, the policy is to direct the student to apply for financial aid (grants, loans, or work-study) and to include the cost of the interpreter services as an educational expense. Only in the case that a student demonstrates to UAB the need for financial aid to pay for an interpreter and an inability to receive the necessary aid or free interpreter services will UAB provide an interpreter for the student.
 
 
 4
 In addition to its regular educational degree programs, UAB has a Division of Special Studies that offers some courses for credit and some non-degree community education and continuing education courses. The Auxiliary Aids Policy excludes students taking non-credit or non-degree courses from receiving auxiliary aids from UAB.[1] The University of Alabama's Chancellor, Thomas A. Bartlett, describes the Special Studies programs as "a public service that is educational." He also admits that in an ideal world, auxiliary aids should be offered to Special Studies students, but that "it's a lower priority than making those services available in [the] credit programs." The Special Studies budget is part of the overall budget for UAB. Special Studies has received several federal grants for its Cooperative Education Program, and uses UAB buildings on an "as available" basis for its classes.
 
 
 5
 UAB's Department of Transportation Services runs an on-campus bus transportation system between 6 a.m. and 6 p.m. daily. The bus route covers approximately one-half of the 65 block campus area and connects outlying employee parking lots to UAB buildings and the UAB medical center. Anyone on campus may use the buses. Approximately 73% of the riders are faculty and staff members, while 16% of the riders are students. During the middle of the day only one bus runs at a time, but during the heaviest use times, 7-9 a.m. and 3-6 p.m., two buses are run. For mechanical reasons, UAB uses each of its five buses for no more than one four-hour period per day. The Department of Transportation Services also has seven vans that it uses to provide off-campus transportation for academic and other campus groups. None of the vans is accessible to wheelchair-bound persons.
 
 
 6
 In 1986, UAB installed a wheelchair lift on one of its five buses at a total cost of $5,000. UAB surveyed 25 handicapped students to determine when peak use for the lift-equipped bus would be each day. Employees and regular visitors to the campus who are also handicapped were not included in the survey. The survey asked the students when they attended classes, and showed the following attendance pattern:
 
 
 7
 8:0010:05 a.m. 16%
 
 
 8
 10:25 a.m.12:30 p.m. 36%
 
 
 9
 1:003:05 p.m. 19%
 
 
 10
 3:255:30 p.m. 16%
 
 
 11
 6:0010:00 p.m. 13%
 
 
 12
 Based on these results, and its policy of running each bus only four hours per day, UAB decided to run the lift equipped bus from 10:00 a.m. to 2:00 p.m. each day. If a handicapped individual needs the bus for a different time period, he or she may call the UAB transportation department 48 hours in advance, and the bus will be re-scheduled to run at a different time so as to accommodate that person. The lift-equipped bus service began in June 1987, and had only one rider in June and none in July. No information about handicapped ridership between July, 1987 and present appears on the record. One handicapped employee stated that she would tend to use the bus more on rainy or cold days, and that she needed the bus to make deliveries around campus that are a part of her job. Of course, she cannot use the bus system to make deliveries before 10 a.m. or after 2 p.m.
 
 
 13
 The district court held that UAB violated section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. Sec. 794 (1988), when it failed to:
 
 
 14
 1) provide interpreter services to deaf students who were unable to procure such services elsewhere free of charge and who were not eligible for financial aid for such services;
 
 
 15
 2) provide any auxiliary aids to students in non-degree programs;
 
 
 16
 3) accommodate mobility impaired students in the business education laboratory; and
 
 
 17
 4) make the UAB swimming pool accessible to mobility-impaired students.
 
 
 18
 UAB is not appealing the district court's third and fourth holdings regarding access to the business education lab and the swimming pool. The district court also found that UAB had made a reasonable accommodation for transportation of mobility-impaired students. The court enjoined UAB from denying students auxiliary aids based on financial ability, and from refusing to grant auxiliary aids to non-credit or non-degree students. The court also ordered UAB to reimburse one family for money they spent on interpreter services.
 
 
 19
 In reaching its decision, the district court found that the Department of Education regulation that precludes the use of a financial needs test in considering whether to provide auxiliary aids to handicapped students is entitled to conclusive weight, because it is neither "unreasonable, 'clearly erroneous,' nor 'demonstrably irrational.' " R1-18, p. 26-27. The court also found that the determination by the Department of Education and the Department of Justice that UAB's Auxiliary Aids policy violates section 504 "is entitled to great weight." Id. at 27.
 
 DISCUSSION
 
 20
 A. Section 504 and the HEW Implementing Regulations
 
 
 21
 Section 504 of the Rehabilitation Act of 1973, as amended, provides that:
 
 
 22
 No otherwise qualified individual with handicaps in the United States, ... shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....
 
 
 23
 29 U.S.C. Sec. 794(a) (1988). In 1977, the Department of Health, Education and Welfare ("HEW") enacted a comprehensive set of regulations. 34 C.F.R. Secs. 104.1-104.54 (1989).[2] Subpart A of these regulations is generally applicable to all recipients of Federal financial assistance from HEW (now the Department of Education). 42 Fed.Reg. 22,676, 22,677 (1977). Section 104.4(b) under Subpart A provides:
 
 
 24
 (1) A recipient, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of handicap;
 
 
 25
 (i) Deny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service;
 
 
 26
 (ii) Afford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded to others; [or]
 
 
 27
 (iii) Provide a qualified handicapped person with an aid, benefit, or service that is not as effective as that provided to others.
 
 
 28
 34 C.F.R. Sec. 104.4 (1989). Subpart E of the regulations applies specifically to "postsecondary education programs and activities, including postsecondary vocational education programs and activities, that receive or benefit from Federal financial assistance...." 34 C.F.R. Sec. 104.41 (1989). Section 104.44(d) under Subpart E provides that:
 
 
 29
 (d) Auxiliary aids. (1) A recipient to which this subpart applies shall take such steps as are necessary to ensure that no handicapped student is denied the benefits of, excluded from participation in, or otherwise subjected to discrimination under the education program or activity operated by the recipient because of the absence of educational auxiliary aids for students with impaired sensory, manual, or speaking skills.
 
 
 30
 (2) Auxiliary aids may include taped texts, interpreters or other effective methods of making orally delivered materials available to students with hearing impairments.... Recipients need not provide attendants, individually prescribed devices, readers for personal use or study, or other devices or services of a personal nature.
 
 
 31
 34 C.F.R. Sec. 104.44 (1989).
 
 
 32
 HEW published a Notice of Intent to Issue Proposed Rules under Section 504 on May 17, 1976 to solicit comments on a number of issues. 41 Fed.Reg. 20296 (1977). The Notice included a proposed set of regulations, along with a section-by-section explanation of the proposed regulations and a statement of the estimated economic and inflationary impact. The statement of estimated economic and inflationary impact predicted that the Subpart E regulations would not impose substantial costs on federal assistance recipients. With respect to the provision of auxiliary aids, the statement noted that "if a deaf student is unable to obtain the services of a classroom interpreter from the vocational rehabilitation agency, the recipient is responsible for providing an interpreter, a written version of class materials, or the opportunity to pursue independent study. [It is not believed that the cost of this requirement] will be substantial as long as enforcement is done in a manner which allows flexibility in means of compliance." 41 Fed.Reg. 20361 (1977).
 
 
 33
 HEW received hundreds of comments in response to this Notice. On July 16, 1977, HEW published a Notice of Proposed Rulemaking that responded to these comments, and included a slightly modified set of proposed regulations. 41 Fed.Reg. 29,518 (1977). The Notice stated that the provision requiring universities to provide auxiliary aids had generated a strong response. Several universities and colleges asserted that the financial burden of providing auxiliary aids should be borne only by state vocational rehabilitation agencies, the Veterans Administration and private charities. Others proposed that universities and colleges be required only to provide permanent equipment that could be used by groups of students, but that readers and interpreters should be considered personal in nature and should not be provided by the institution. Several others suggested that recipients provide a referral service to refer students to existing financial sources for auxiliary aids and maintain lists of qualified readers, interpreters and attendants. 41 Fed.Reg. 29,557 (1977).
 
 
 34
 In response to these comments, HEW modified the auxiliary aids regulation such that universities could meet the requirements of section 504 by referring students to state vocational rehabilitation agencies and private charities as a first step in obtaining auxiliary aids. The regulations nevertheless maintained the requirement that "[w]here no such existing resources supply auxiliary aids, the proposed regulation obligates the recipient to provide the needed auxiliary aid." 41 Fed.Reg. 29558 (1977). HEW noted that it anticipated that the bulk of the costs of auxiliary aids would be paid by state and private agencies, and that the proposed regulation allowed universities considerable flexibility in providing auxiliary aids, including using students who are earning degrees in fields related to handicapped persons to provide the necessary services. Id.
 
 
 35
 After receiving and considering additional comments on the modified proposed regulations, HEW published the final regulations on May 4, 1977. 42 Fed.Reg. 22676 (1977). In the accompanying analysis of the final regulations, HEW acknowledged the concern of colleges and universities about the costs of compliance with the auxiliary aids regulation, but emphasized that recipients "can usually meet this obligation by assisting students in using existing resources for auxiliary aids such as state vocational rehabilitation agencies and private charitable organizations." 42 Fed.Reg. 22,692 (1977). HEW repeated its prediction that the bulk of the costs of auxiliary aids would be paid by these state and private agencies, and that the regulation allowed universities significant flexibility in choosing the methods by which they would provide aids when students were unable to obtain them elsewhere. Id.
 
 
 36
 UAB argues that its policy is consistent with the HEW auxiliary aids regulation. UAB contends that the regulation only requires it to provide auxiliary aids to handicapped students who are "otherwise qualified" to receive financial aid. The government argues that the history of the formulation of the regulations summarized above clearly indicates that HEW intended for the burden of providing auxiliary aids to be shouldered by the university, whether the university obtained such services for the student through a state vocational rehabilitation service, private charities, or the university's own funds. In response to the concerns voiced by colleges and universities about the costs associated with providing auxiliary aids, HEW noted that the regulation anticipated that recipients would use state vocational rehabilitation services and private charities as a means of meeting this obligation. HEW nevertheless made clear that if these sources were unavailable, the university was responsible for providing the auxiliary aid. In all explanations of the regulation, the government contends that HEW consistently spoke of the obligation of ensuring that an auxiliary aid was available to any handicapped student who needed one as being an obligation of the university. Nothing in these statements indicated that HEW intended for the handicapped student to be responsible for providing an auxiliary aid.
 
 
 37
 Under the UAB policy, instead of being the primary source for the provision of auxiliary aids, the university merely disseminates information as to possible sources of free services or loans to pay for the services, and becomes a source of last resort for students who have been otherwise unable to procure auxiliary aid services. Thus, the university's policy shifts the burden of providing auxiliary services onto the shoulders of the student. Most handicapped students are forced to either procure the services through state or private agencies, or pay for them themselves from personal resources or by incurring increased financial aid debt.[3] The Department of Education's position in this litigation on the meaning of the auxiliary aids regulation is consistent with the language of the regulation itself and with the original explanation of the regulation during the notice and comment period. Under these circumstances, the Department of Education's assertion that UAB's incorporation of a financial need test into its auxiliary aids policy violates the regulation is entitled to substantial deference. Mullins Coal Co. v. Director, O.W.C.P., 484 U.S. 135, 159, 108 S.Ct. 427, 440, 98 L.Ed.2d 450 (1987) (Holding that an agency's consistent interpretation of a regulation it promulgated deserves substantial deference unless it is plainly erroneous or inconsistent with the regulation.); Lollar v. Alabama By-Products Corp., 893 F.2d 1258, 1262 (11th Cir.1990).
 
 
 38
 B. Reasonableness of the Auxiliary Aids Regulation
 
 
 39
 Having accepted the Department's interpretation of its regulation as prohibiting a university from denying an auxiliary aid to a handicapped student on the basis that the student has failed to demonstrate a need for financial assistance, we must determine whether such a regulation conflicts with Congress' intent in passing section 504. Section 504's general language and sparse legislative history do not reveal that Congress directly addressed the issue of whether universities should be required to provide funding for auxiliary aids only for those students who demonstrate financial need.[4] Our scope of review of the regulations promulgated by HEW is limited, therefore, to a determination of whether the agency's interpretation of section 504 is based on a permissible construction of the statute. Chevron, U.S.A., Inc. v. National Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). A permissible construction of the statute is one which is reasonable in light of the language, policies, and legislative history of the statute. United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 131, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985).
 
 
 40
 In support of the reasonableness of HEW's auxiliary aids regulation, the government argues that the Supreme Court has repeatedly held that the HEW regulations are due significant deference. In Consolidated Rail Corp. v. Darrone, 465 U.S. 624, 634, 104 S.Ct. 1248, 1254, 79 L.Ed.2d 568 (1984), the Supreme Court held that the HEW regulations merited particular deference in the case of section 504 because "the responsible congressional Committees participated in their formulation, and both these Committees and Congress itself endorsed the regulations in their final form." See also School Board of Nassau County, Fla. v. Arline, 480 U.S. 273, 279, 107 S.Ct. 1123, 1127, 94 L.Ed.2d 307 (1987); Alexander v. Choate, 469 U.S. 287, 304 n. 24, 105 S.Ct. 712, 722 n. 24, 83 L.Ed.2d 661 (1985). Nevertheless, the Department's regulations are not conclusive on the issue of Congressional intent. Southeastern Community College v. Davis, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979); Medical Center Hospital v. Bowen, 839 F.2d 1504 (11th Cir.1988). In Davis, the Supreme Court noted that although agency interpretations are due some deference, when the regulation is challenged as exceeding the scope of the statute, the courts are constrained by their obligation to honor the clear meaning of the statute, "as revealed by its language, purpose and history." 442 U.S. at 411, 99 S.Ct. at 2369, 60 L.Ed.2d at 980. The Eleventh Circuit has explained this holding as follows:
 
 
 41
 [A]n agency acting within its authority to make policy choices consistent with the congressional mandate should receive considerable deference from courts, provided, of course, that its actions conform to applicable procedural requirements and are not "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law," 5 U.S.C. Sec. 706(2)(A). When an agency's decision is premised on its understanding of a specific congressional intent, however, it engages in the quintessential judicial function of deciding what a statute means. In that case, the agency's interpretation, particularly to the extent it rests on factual premises within its expertise, may be influential, but it cannot bind a court.
 
 
 42
 Medical Center, 839 F.2d at 1510 (citations omitted).
 
 
 43
 We must, therefore, attempt to make an independent determination of Congress' intent in passing section 504 as it relates to the provision of auxiliary aids to university students. Two Supreme Court decisions have established important guidelines for interpreting section 504. In Southeastern Community College v. Davis, 442 U.S. at 397, 99 S.Ct. at 2361, 60 L.Ed.2d at 980, the Court held that neither the language, purpose nor legislative history of section 504 revealed an intent to impose affirmative action obligations on recipients of federal funds. The plaintiff, a deaf student, brought a section 1983 claim against a university, arguing that section 504 required a nursing school to waive certain "practical" course requirements, and to arrange to have a professor with her whenever she attended to a patient. In rejecting her claim, the Court reasoned that section 504 did not require recipients to make substantial changes in their programs nor to make changes that would cause "undue financial or administrative burdens." Id. at 412, 99 S.Ct. at 2370, 60 L.Ed.2d at 980.
 
 
 44
 In Alexander v. Choate, 469 U.S. at 287, 105 S.Ct. at 712, 83 L.Ed.2d at 661, the Court was presented with an opportunity to clarify its ruling in Davis. In Alexander, handicapped Medicaid recipients challenged a state's proposal to reduce its Medicaid program's in-patient hospital coverage from 21 days to 14 days for all patients. The plaintiffs argued that because the average hospital stay for handicapped Medicaid recipients was greater than 14 days, this reduction in coverage would violate section 504 by denying them "meaningful access" to Medicaid in-patient hospital coverage. The Court agreed with the plaintiff's assertion that section 504 requires recipients of federal financial assistance to provide the handicapped meaningful access to the benefit conferred, but found that the state's proposed reduction in coverage did not deny handicapped persons such meaningful access.
 
 
 45
 The Court reasoned that the state's Medicaid program was not intended to guarantee "adequate health care" to all recipients, and that Medicaid programs do not guarantee that each beneficiary will receive a level of health care precisely tailored to his or her needs. Therefore, the Court held, section 504 does not require the state to alter its program to meet the reality that the handicapped have greater medical needs. Id. at 303, 105 S.Ct. at 721, 83 L.Ed.2d at 661. While section 504 requires that the handicapped have equal access to Medicaid, it does not guarantee them equal results. Because the proposed reduction did not deny handicapped recipients the same access to in-patient coverage that would be offered to non-handicapped recipients, it did not violate section 504. Id. at 304, 105 S.Ct. at 722, 83 L.Ed.2d at 661. In reaching this conclusion, the Court further explained its holding in Davis, stating that "Davis struck a balance between the statutory rights of the handicapped to be integrated into society and the legitimate interests of federal grantees in preserving the integrity of their programs." Id. at 300, 105 S.Ct. at 720, 83 L.Ed.2d at 661. While section 504 does not mandate affirmative action, and thus grantees "may not be required to make 'fundamental' or 'substantial' modifications to accommodate the handicapped, [they] may be required to make 'reasonable' ones." Id.
 
 
 46
 UAB argues that its auxiliary aids policy, like the state's Medicaid program in Alexander, offers the same benefit to all qualified students. That benefit is the opportunity to be educated and earn a college degree. UAB does not, however, guarantee each student equal results. UAB does not offer each student an educational program specifically tailored to his education needs. Some students are smarter than others, some work harder than others. Some students incur more expenses than others. UAB simply opens its doors to those who meet certain academic requirements and who can muster up the funds to pay, and offers them the chance to learn. Therefore, under Alexander, UAB is not required to change its program simply to meet the reality that the deaf must spend more money to receive the same results as hearing students.
 
 
 47
 This argument ignores the fact that in some instances the lack of an auxiliary aid effectively denies a handicapped student equal access to his or her opportunity to learn. In Alexander, the 14 days of in-patient coverage offered by the state provided the same benefit to handicapped Medicaid recipients, as non-handicapped, i.e., the benefit of 14 days of hospital care. Depending on the severity of their illness, some people would benefit proportionately more than others, but the handicapped were not excluded from this benefit. A university, by offering lecture, laboratory and discussion courses, also offers a benefit to its students. Some students, by virtue of their innate intelligence or their willingness to study, will benefit more from this opportunity than others. In the case of a deaf student, however, all access to the benefit of some courses is eliminated when no sign-language interpreter is present. In the context of a discussion class held on the third floor of a building without elevators, a deaf student with no interpreter is as effectively denied meaningful access to the class as is a wheelchair bound student. Just as providing 14 days of in-patient coverage was, on the average not as beneficial for handicapped persons as nonhandicapped, the provision of an auxiliary aid still may not eliminate the disadvantages suffered by handicapped students in the classroom. For example, having an interpreter would not be as effective as being able to hear a lecture or the comments and questions of fellow classmates oneself, as some things will probably get lost in the translation. Nevertheless, under Davis, if the provision of interpreters when necessary would not impose an undue financial burden on UAB, then it would be a reasonable accommodation which would allow deaf students to get some benefit from attending UAB, just as having 14 days of in-patient coverage provided some benefit to handicapped Medicaid recipients.
 
 
 48
 UAB acknowledges that the lack of an interpreter may in some instances deny a deaf student meaningful access to education. It contends, however, that by requiring the university to provide auxiliary aids for students who are not eligible for financial aid, the regulation exceeds the scope of section 504 by effectively mandating "affirmative action." The Department of Education argues that the auxiliary aids regulation does not impose an affirmative action requirement, but instead requires universities to make reasonable accommodations to allow handicapped students equal access to a university education.
 
 
 49
 The Supreme Court noted in Davis that the "line between a lawful refusal to extend affirmative action and illegal discrimination against handicapped persons will not always be clear. Identification of those instances where refusal to accommodate the needs of a disabled person amounts to discrimination against the handicapped continues to be an important responsibility of HEW." 442 U.S. at 412-13, 99 S.Ct. at 2370, 60 L.Ed.2d at 980. HEW's decision that the provision of interpreters is necessary to comply with the non-discrimination mandate of section 504, and does not amount to an affirmative action requirement, is a policy choice that HEW is empowered to make. Chevron, 467 U.S. at 843, 104 S.Ct. at 2782, 81 L.Ed.2d at 694 ("The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left ... by Congress.") The Supreme Court has repeatedly noted that these types of policy choices made by HEW in promulgating the implementing regulations for section 504 are due substantial deference because the regulations were enacted with the oversight and approval of Congress. Arline, 480 U.S. at 279, 107 S.Ct. at 1127, 94 L.Ed.2d at 307; Alexander, 469 U.S. at 304 n. 24, 105 S.Ct. at 722 n. 24, 83 L.Ed.2d at 712; Consolidated Rail, 465 U.S. at 634, 104 S.Ct. at 1254, 79 L.Ed.2d at 568.
 
 
 50
 Soon after the final HEW regulations became effective, HEW reported on the rulemaking process and the final regulation to a Congressional oversight committee. Implementation of Section 504, Rehabilitation Act of 1973, Hearings Before the House Subcomm. on Select Education of the House Comm. on Education and Labor, 95th Cong. 1st Sess. 291 (1977) (Statement of David S. Tatel, Office for Civil Rights, Sept. 16, 1977). In 1978, Congress amended the Rehabilitation Act of 1973 to require state vocational rehabilitation centers to provide technical assistance, including interpreters, to universities to assist them in complying with the Rehabilitation Act, and "particularly the requirements of" section 504. Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, Sec. 115(a)(2), 29 U.S.C. Sec. 775(a)(2) (1988). In light of Congress' awareness of HEW's decision that universities should be required to provide interpreters and other auxiliary aids for students, the 1978 amendment requiring state vocational rehabilitation centers to assist universities in meeting this requirement signals Congressional approval of the policy choice made by HEW. We find, therefore, that the legislative history of section 504, along with the Supreme Court interpretations of section 504 in Davis and Alexander, indicate that HEW's auxiliary aids regulation is based on a permissible construction of the statute.[5]
 
 
 51
 UAB argues that because section 504 is premised on Congress's spending power, the imposition of the burden of providing free interpreter services cannot be valid unless explicitly set forth in the legislation. Pennhurst State School and Hospital v. Halderman, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). In Pennhurst, the Supreme Court held that Congress must make explicit the conditions of accepting federal monies disbursed under the spending power, analogizing the relationship between Congress and recipients as a contractual relationship. Id. at 17, 101 S.Ct. at 1540, 67 L.Ed.2d at 694. UAB argues that the very plain non-discrimination language in section 504 says nothing about the provision of interpreters, or about who is to bear the cost of non-discrimination. This argument has been rejected by the Supreme Court. School Board of Nassau County v. Arline, 480 U.S. at 286-87 n. 15, 107 S.Ct. at 1130 n. 15, 94 L.Ed.2d at 307 (1987). Unlike the findings at issue in Pennhurst, which indicated "no more than a congressional preference--at most a nudge in the preferred direction," Section 504 clearly states that those who receive any federal funds may not discriminate against persons solely on the basis of a handicap. Id. (quoting Wright v. Roanoke Redevelopment & Housing Authority, 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987).
 
 C. Non-credit and Non-degree Programs
 
 52
 The district court held that UAB's auxiliary aids policy violated section 504 insofar as it excludes "special" students from eligibility for assistance in the form of auxiliary aids. "Special" students are those enrolled in non-credit or non-degree programs, which are operated through UAB's Division of Special Studies. Subpart E of the HEW regulations apply to "postsecondary education programs and activities ... that receive or benefit from Federal financial assistance...." 34 C.F.R. Sec. 104.41 (1989). The Department of Education argues that non-credit and non-degree programs, which include both continuing education programs and courses such as canoeing and chess, are nevertheless educational programs, and that nothing in subpart E is intended to limit its coverage to only programs that lead to a college degree. This interpretation of subpart E by the Department is reasonable and consistent with the language of the regulation, and therefore is due substantial deference. Mullins Coal Co. v. Director, O.W.C.P., 484 U.S. at 159, 108 S.Ct. at 440, 98 L.Ed.2d at 450; Lollar v. Alabama By-Products Corp., 893 F.2d at 1262. Moreover, any doubt that section 504 was intended to cover non-degree and non-credit programs was resolved by the Civil Rights Restoration Act of 1987, Sec. 4(b)(2), 29 U.S.C. Sec. 794(b)(2) (1988), which provides that section 504 applies to "all of the operations of ... a college, university, or other postsecondary institution...." (emphasis added). The Department of Education's application of its auxiliary aids regulation to the Division of Special Studies and all non-degree and non-credit programs of UAB is therefore based on a permissible construction of section 504.
 
 D. UAB's Bus System
 
 53
 The district court held that section 504 applies to UAB's Department of Transportation Services and that UAB has made a reasonable accommodation for the transportation of its handicapped students by providing lift-equipped bus service between 10 a.m. and 2 p.m. every day. Although a district court's determination of what is "reasonable" rests in large part upon factual determinations, our review of the record leaves us with the definite impression that the district court erred in holding that, as a matter of law, UAB has made a reasonable accommodation in the transportation services it offers to students. The Department of Education's regulations provide that a recipient of Federal financial assistance may not "afford a handicapped person an opportunity to participate in or benefit from" any service provided by the recipient that "is not equal to that afforded to others" or that "is not as effective as that provided to others." 34 C.F.R. Sec. 104.4(b)(1) (1989). The stipulated facts in the record indicate that UAB's Department of Transportation offers transportation services beyond the daily on-campus bus service, and that its services are not intended to benefit only students. As the district court noted, the bus system is open to faculty, staff, students and visitors. Approximately 73% of the riders are UAB faculty and staff members, while approximately 16% are students. Although the bus system does not cover the entire campus, it does connect the medical center complex with remote parking areas and the University College. Aside from operating the daily on-campus bus service, the Department of Transportation also maintains 7 vans that are used for academic field trips and other off-campus activities.
 
 
 54
 The stipulated facts also reveal that UAB is not offering transportation services to handicapped persons on an equivalent basis with those offered to non-handicapped persons. Only one of UAB's five buses and none of its vans are accessible to mobility impaired people. The existence of only one lift-equipped bus, combined with the necessity of running each bus only four hours per day, results in handicapped persons being unable to benefit from the daily on-campus transportation service for 8 out of its 12 hours of operation. The policy of shifting the hours in which the lift-equipped bus runs upon 48 hours notice does not serve to make the daily bus service equally accessible to handicapped persons. Non-handicapped persons benefit from bus service that they can rely on being available all day, every day. Although shifting the hours of operation of the lift-equipped bus may help the person who requested the shift, it prevents any handicapped person from relying on the availability of the bus at any given time during the day. The absence of any lifts on the university's seven vans also means that campus groups with mobility impaired members who wish to make an off-campus trip must reserve the only lift equipped bus, or have the Department of Transportation arrange for them to rent an accessible vehicle from a commercial agency. Both of these alternatives are more costly to the campus group than the use of one of UAB's vans.[6] Furthermore, on any day that the only lift equipped bus were used for an off-campus trip, no daily bus service would be available to handicapped persons.
 
 
 55
 Thus, the transportation services provided to handicapped persons are clearly "not equal to" nor "as effective as" the transportation services offered to non-handicapped persons. Under the Supreme Court's interpretation of section 504, recipients of Federal financial assistance are required to make "reasonable" accommodations, but only to the extent that such accommodations would not cause "undue financial or administrative burdens." Davis, 442 U.S. at 397, 99 S.Ct. at 2361, 60 L.Ed.2d at 980; Choate, 469 U.S. at 287, 105 S.Ct. at 712, 83 L.Ed.2d at 712. The record shows that the cost of installing a lift on UAB's buses is $5,000. By installing lifts on two more buses, UAB could provide handicapped persons full 12 hour on-campus bus service equivalent to that provided to non-handicapped persons. Even if none of the seven vans were equipped with a lift, UAB could reasonably accommodate campus groups with mobility-impaired members by arranging to rent accessible vehicles from commercial agencies, and charging the group the same amount that they would have paid for using a UAB van. In light of UAB's annual transportation budget of $1.2 million, an expenditure of $15,000,[7] plus occasional amounts representing the difference in commercial rental fees versus the UAB rental fee for vans, is not likely to cause an undue financial burden on UAB.[8]CONCLUSION
 
 
 56
 Having determined that the Department of Education's auxiliary aids regulation prohibits universities from denying auxiliary aids to students on the basis that they do not qualify for financial aid, and that this regulation is based on a permissible construction of section 504 of the Rehabilitation Act of 1973, as amended, we AFFIRM the district court's order enjoining UAB from denying auxiliary aids to handicapped students based on consideration of their financial status. We also AFFIRM the district court's order enjoining UAB from denying auxiliary aids to special students or those enrolled in the Special Studies program, based on our conclusion that the auxiliary aids regulation applies to such students and that its application to them is based on a permissible construction of section 504. Because we find that UAB has not made a reasonable accommodation for the handicapped in the provision of its transportation services, we REVERSE the district court's holding as to this issue, and REMAND this case to the district court for consideration of an appropriate remedy.
 
 
 57
 AFFIRMED in part, REVERSED in part, and REMANDED.
 
 
 
 *
 See Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit
 
 
 **
 Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation
 
 
 [1]
 UAB classifies students in non-degree programs as "special" students, and its auxiliary aids policy provides that these "special" students are ineligible for assistance with auxiliary aids
 
 
 [2]
 HEW's enforcement responsibilities over federally funded education programs were transferred to the Department of Education by the Department of Education Organization Act, Pub.L. No. 96-88, 93 Stat. 668, 677 (1979). HEW's regulations were recodified without significant changes by the Department of Education at 34 C.F.R. Part 104
 
 
 [3]
 The record indicates that since UAB's Auxiliary Aids Policy has been in effect, no deaf student's need for a sign-language interpreter has been met by UAB, as no student has demonstrated an inability to obtain such services elsewhere through state or private agencies or financial aid
 
 
 [4]
 There were no public hearings accompanying the original bills proposing the Rehabilitation Act of 1973, and it was passed with almost no substantive floor debate
 
 
 [5]
 In reaching this conclusion, we have considered the possibility that as applied to UAB, the auxiliary aids regulation might impose an "undue financial burden." UAB has not explicitly argued that the regulation would impose such a burden, but does note that sign-language interpreters charge between $5 and $10 per hour, which it considers "costly." Nevertheless, the stipulated facts indicate that the Alabama Vocational Rehabilitation Service ("VRS") will provide interpreters regardless of economic need to full-time students in programs VRS considers reasonably likely to lead to employment. R1-16, # 49. Furthermore, not all hearing-impaired students need sign language interpreters for all classes. Some students can tape-record lectures, and have volunteers at the UAB Handicapped Services office transcribe the tapes, while others have fellow students take notes for them. R1-16, # 30-33. Our ruling, therefore, will result in UAB being required to furnish interpreters only to those students who are not eligible for VRS assistance, cannot obtain interpreter services from private charitable organizations, and for whom the provision of an interpreter is the only method by which they will have meaningful access to the class
 
 
 [6]
 Deposition of John Powell, Director of Transportation Services, at 14-17, 119-121, 123-126
 
 
 [7]
 The government asserts in its brief that the average life of a bus is 12 years. Brief of Appellee/Cross-Appellant at 49. Although we have been unable to find the source of this information in the record, we can safely assume that amounts spent now on purchasing lifts for UAB's buses (or vans) would provide accessibility to UAB's transportation services over a period of several years
 
 
 [8]
 Our discussion of one way in which UAB could accommodate handicapped riders is intended only to illustrate that UAB could provide equally effective transportation services to handicapped riders without incurring an "undue financial burden", and therefore it has not made a reasonable accommodation. This discussion is not intended to limit the district court's discretion on remand in working with the parties to fashion an appropriate remedy