**Ronald G. HALASZ, Plaintiff,**

v.

**UNIVERSITY OF NEW ENGLAND, Defendant.**

Civ. No. 92–52–P–C.

United States District Court, D. Maine.

March 5, 1993.

Russell Stryker, Maine Advocacy Services, Augusta, ME, for plaintiff.

Frederick Moore, Robinson, Kriger, McCallum & Greene, P.A., Portland, ME, for defendant.

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

GENE CARTER, Chief Judge.

In this action Plaintiff seeks declaratory and injunctive relief as well as damages for Defendant's alleged violation of Plaintiff's rights under § 504 of the Rehabilitation Act of 1973. Defendant filed a motion for summary judgment on October 23, 1992. (Docket No. 14). Plaintiff filed his objection to the motion on January 4, 1993. (Docket No. 32).

Under Federal Rule of Procedure 56(c), summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." As the Court of Appeals for the First Circuit has recently stated:

> When, as here, the movant-defendant has suggested that competent evidence to prove the case is lacking, the burden devolves upon the nonmovant-plaintiff to

"document some factual disagreement sufficient to deflect *brevis* disposition." ...

This burden is discharged only if the cited disagreement relates to a genuine issue of material fact.... "In this context, 'genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party [and] 'material' means that the fact is one that might affect the outcome of the suit under the governing law." ... This requirement has sharp teeth: the plaintiff "must present definite, competent evidence to rebut the motion." ...

*Wynne v. Tufts University School of Medicine,* 976 F.2d 791 (1st Cir.1992) (citations omitted).

## I.

The undisputed facts as set forth in Defendant's statement of material facts and supported by the record are as follow. The University of New England is a private college in Biddeford. Its catalog for 1990–91 stated its policy that "no discrimination on the grounds of ... handicap, ... will exist in any area." Admission to the college is competitive, based upon, *inter alia*, the applicant's course of study in high school, grades and class standing, written recommendations and scores obtained on standardized college aptitude tests. At the time Plaintiff applied, the university had separate admissions criteria for transfer students. Students with a grade point average of at least 2.5 were considered for, but not guaranteed, admission. Those with averages below 2.5 might be considered, but it would have been a rare exception for a transfer applicant with an average below 2.0 to be admitted.[1]

At the time Plaintiff applied, U.N.E. also ran programs for students with learning disabilities. For example, students who qualified for admission to the university could also participate in the Individual Learning Program (ILP), which offers specific support services appropriate for the learning disabled in a university setting. These services include access to taped textbooks/readers, proctors/readers for untimed exams, diagnostic testing, and supervision and counseling by a learning specialist.

A second program, called First Year Option (FYO)[2], was for learning disabled students who did not have the academic credentials necessary for admission to the degree programs.[3] The FYO program was designed to provide those students with an integration/transition period during which they could, in an unmatriculated status, take one or two degree courses per semester while receiving the same support services for their learning disabilities that are available to students in the ILP.

Students who completed the FYO program could apply for regular admission to U.N.E. Their admission was based on their academic and social adjustment during the FYO program. Only FYO students with a cumulative grade point average of at least 2.0 for "two consecutive regular semesters, i.e. fall and spring or spring and fall,"[4] were recom-

1. Each year a small number of first year students who have demonstrated the ability to achieve success at U.N.E. in some respects but who do not present consistently high academic credentials are admitted on a conditional basis.

2. The FYO program has been discontinued.

3. Plaintiff disputes this fact, citing the affidavit of a fellow student, his own memorandum and his own affidavit. Although Plaintiff avers that he was later admitted to another college where he is experiencing success, this fact does not generate a material issue about his qualifications for admission to the *UNE* baccalaureate program. Similarly, the fact that Jennifer Woolcott, a fellow FYO student, felt she was initially qualified for admission to the regular baccalaureate program based on her high school record and her success in the FYO program, is immaterial.

Plaintiff has offered no evidence from which the Court could infer that students in the FYO program were qualified for admission to UNE's degree program except for their learning disabilities. He has offered no evidence which the Court could use to compare Plaintiff's or other FYO students' credentials with those of regularly matriculated students. He merely offers FYO students' subjective evaluations of their own credentials. This is insufficient to generate a genuine issue of fact.

4. U.N.E. also has a short winter term, which does not count for the FYO student's grade point average. UNE's reason for not including winter term grades is that widely varying types of courses with differing academic and nonacademic requirements are taught in that term, and the grades are not considered reliable indicators of

mended for regular admission. Manganello Aff. ¶ 11.

Plaintiff applied to U.N.E. seeking admission in January 1991 as a transfer student. His high school record contained many failures and D grades. His cumulative grade point average from three previously attended colleges in New York was 1.98 (out of 4.0). Moreover, he had been required to withdraw from the State University of New York at Fredonia for academic reasons. The admissions officers at U.N.E. had doubts about his ability to adjust to college pressures given his inability to complete any program at the three previous academic institutions. In both timed and untimed reading tests, Plaintiff got the lowest possible score. On the Scholastic Aptitude Test, which Plaintiff had taken in a timed setting, his scores were also very low. An experienced UNE admissions officer avers that during her tenure the University has never accepted an applicant with academic credentials as poor as those of Plaintiff.

Plaintiff suffers from a learning disability and Tourette's Syndrome. He initially called U.N.E. because he was interested in its program for the learning disabled. In the call he stated he was learning disabled. With his application, he also wrote a letter to the Director of the ILP, stating that his transcripts and test scores did not reflect his abilities because of lack of understanding and accommodation for his disabilities by his former teachers and testers. Based on his academic record, Plaintiff was considered unqualified for admission to U.N.E. as a regular transfer student. He was, however, admitted to the FYO.

Plaintiff enrolled in two college level courses, Psychology I and Human Development I, in his first semester, as well as in several non-college-level remedial courses. He was assigned tutors in both courses, but dropped Psychology very early in the semester. He requested that he be provided with a notetaker as well as a tutor for Human Development, but his ILP learning specialist refused, believing it better to evaluate Plaintiff's own capabilities in that regard before concluding such services were necessary. Plaintiff's grade in Human Development was a C−, giving him a GPA of 1.75 after the first semester.

In his second FYO semester, Plaintiff again enrolled in two college level courses. Although advised to drop one of the courses because of his struggles the previous semester, he declined to do so during the add/drop period. Ultimately, however, he withdrew from one of the courses. He earned a D in the course he finished, giving him a cumulative G.P.A. at the end of his second semester of 1.375.

Plaintiff was offered the same services which had successfully helped other FYO students qualify for regular admission at U.N.E.[5] He received advising from an ILP specialist at least weekly. He had peer tutors, some taped texts, proctored, untimed testing, oral testing, and readers for some of his classes. He also had remedial courses, as well as access to a writing specialist at times during both semesters and to a reading specialist in the fall semester.

ILP and FYO participants are assessed a fee for services provided exclusively to them. The fee varies depending on use of the services. The highest use fee in 1990–91 was $1450. The next year it was $1550. Regularly admitted U.N.E. students taking twelve credit hours per semester were charged $362.50 per credit hour. An FYO student

students' academic qualifications for regular admission. Winter term grades are, however, used to evaluate regular degree candidates who have already demonstrated that they possess the qualities necessary for successful participation in U.N.E.'s undergraduate degree program.

5. Plaintiff disputes this fact on the grounds that UNE administrators questioned and then dropped the FYO program because it had a 50% attrition rate. As explained by UNE administrator, Dr. Pamela Leone: "We discussed ... that that program has a very high attrition rate and

requires a tremendous investment of energy and that we might be better off offering that energy to students who were less of a high risk for failure." Leone Tr. at 22. The program did work for 50% of the students, however, so the statement offered by Defendants is correct. There is no basis for Plaintiff's assumption that all students who do not meet the academic credentials for regular admission will succeed in the FYO program. As Dr. Leone points out, the FYO participants are high risk students.

taking a similar load, but including only one or two college level classes and some remedial courses, was charged $145 per credit hour plus the applicable ILP fees.

## II.

Section 504 of the Rehabilitation Act of 1973 provides that "[n]o otherwise qualified individual with handicaps in the United States ... shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794. The regulations accompanying the statute make clear that coverage can extend to those individuals with specific learning disabilities. 34 C.F.R. Ch. 1 § 104.3(j)(2)(i).

Citing *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), and *Doe v. New York University,* 666 F.2d 761 (2d Cir.1981), Defendant argues that Plaintiff is not an "otherwise qualified" individual entitled to the protection of Section 504. In *Davis* and in *Doe,* the courts had defined an "otherwise qualified" person as "one who is able to meet all of a program's requirements in spite of his handicap." *Davis,* 442 U.S. at 406, 99 S.Ct. at 2367; *Doe,* at 775. In both *Davis* and *Doe,* the courts had declared that the Act did not impose an affirmative action obligation on recipients of federal funds. *Davis,* 442 U.S. at 411, 99 S.Ct. at 2369; *Doe,* at 775.

The Court of Appeals for the First Circuit has recently addressed the operation of Section 504 in the academic context when a medical student with learning disabilities sued his medical school. *Wynne v. Tufts,* 976 F.2d 791; previous opinion 932 F.2d 19 (1st Cir.1991). Discussing the evolution of the "arguably absolutist principles of *Davis,*" *Wynne,* 932 F.2d at 24, the court

concluded that, in determining whether an aspiring medical student meets section 504's "otherwise qualified" prong, it is necessary to take into account the extent to which reasonable accommodations that will satisfy the legitimate interests of both the school and the student are (or are not) available and, if such accommodations ex-

ist, the extent to which the institution explored those alternatives.... Recognizing the unique considerations that come into play when the parties to a Rehabilitation Act case are a student and an academic institution, particularly a medical school training apprentice physicians, we formulated a test for determining whether the academic institution adequately explored the availability of reasonable accommodations:

If the institution submits undisputed facts demonstrating that the relevant officials within the institution considered alternative means, their feasibility, cost and effect on the academic program, and came to a rationally justifiable conclusion that the available alternatives would result either in lowering academic standards or requiring substantial program alteration, the court could rule as a matter of law that the institution had met its duty of seeking reasonable accommodation. In most cases, we believe that, as in the qualified immunity context, the issue of whether the facts alleged by a university support its claim that it has met its duty of reasonable accommodation will be a purely legal one. Only if essential facts were genuinely disputed or if there were significantly probative evidence of bad faith or pretext would further fact finding be necessary.

*Wynne,* 976 F.2d at 792–93 (citations omitted) (*quoting Wynne,* 932 F.2d at 26).

### A. Count I

▇ Plaintiff alleges in Count I that Defendant twice discriminated against him on the basis of his handicap: first when it denied him regular admission to its undergraduate program, and again when it denied him admission to the regular program after completion of the FYO program. Plaintiff alleges that he should not have been placed in the FYO program because he met the requirements for admission of transfer students despite his disability.

The undisputed facts submitted by Defendant show that Plaintiff was not academically qualified for admission to U.N.E. as a transfer student. The admissions officer at

**42**

U.N.E. avers that it would have been a rare exception for a transfer student with a cumulative GPA of less than 2.0 to be admitted. Plaintiff had a cumulative GPA of 1.98 at the other institutions at which he had studied. The other indicia of Plaintiff's academic potential which were available to the admissions office at the time he applied did not mark him as the "rare exception" who would be academically qualified for the U.N.E. program despite a low grade point average.

■ Plaintiff's SAT scores were "very low," as described both by him and Defendant's admissions officer. Although in his application materials Plaintiff sought to explain these low scores by the fact that he had not taken the test untimed,[6] on both timed and *untimed* diagnostic reading comprehension tests, Plaintiff scored in the first percentile, the lowest possible score. Moreover, Plaintiff had never completed any of the programs at the schools in which he had been previously been enrolled, even though, as shown in his essay in support of his application, one of them was a special program for learning disabled students. His better grades in those programs were generally in non-academic subjects while he failed or

withdrew from many of his academic college courses. Plaintiff does not dispute Ms. Cribby's statement that during her tenure at U.N.E., no student with academic credentials as poor as Plaintiff's was ever accepted as a transfer student.

The record shows that UNE does not discriminate in its admissions process against students with learning disabilities. It regularly evaluates and admits learning disabled students to its baccalaureate program. Some of these students, who demonstrate in the admissions process that they are academically qualified for UNE, are admitted without condition and some on the condition that they participate in the ILP, which is designed "to promote and enhance learning disabled students' independent and successful academic functioning as quickly as possible." Affidavit of Patricia Cribby; ¶¶ 11, 12; UNE Catalog, at 36. Some of the learning disabled students admitted without condition also choose to participate in the ILP. UNE's admissions policy, therefore, accommodates for learning disabled students who are *not already functioning independently and successfully in an academic setting.* In considering Plaintiff for admission, UNE

---

**6.** Plaintiff now asserts that UNE acted illegally in considering his SAT scores because the giving of the SAT in a timed setting discriminates against students with learning disabilities. The regulations interpreting § 504 prohibit the use by educational institutions of *any tests* which have a disproportionate, adverse effect on handicapped persons unless the test has been validated as a predictor of success in the education program and alternate tests that have less disproportionate, adverse effects are not shown by the Secretary to be available. 34 C.F.R. § 104.42(b)(2).

The Court rejects Plaintiff's premise. UNE requires students to submit either SAT or ACT standardized aptitude test scores. The SAT, submitted by Plaintiff, is not one that has a disproportionate, adverse effect on handicapped persons because, as noted by Plaintiff himself, it is available in special formats for the handicapped, including an untimed format that does not discriminate against people like him with learning disabilities.

Plaintiff further argues that UNE violated 34 C.F.R. § 104.42(b)(3), which provides that a school must assure itself that admissions tests are selected and administered so as to ensure that the test accurately reflects a handicapped applicant's aptitude or achievement level. The regulation, unlike the previous regulation, speaks only of admissions tests, rather than of "any test

or criterion for admission," 34 C.F.R. § 104.42(b)(2). The Court is satisfied that § 104.42(b)(3) applies to admissions tests administered by a school and not to other criteria of admission, and that it does not impose an obligation on UNE and other colleges and universities to oversee the administration of national standardized tests to all of its applicants who, as is evident by Plaintiff's application, come from far-flung states. The SAT is not an admissions test covered by the cited regulation. It is one of many criteria for admission used by UNE.

It was incumbent upon Plaintiff to take the test in the desired form and submit those scores. Plaintiff, knowing full well that another test format suitable to his condition was available, *see* Halasz Dep.Ex. 6, decided to submit his timed SAT scores and then tell Defendant not to consider them. This is tantamount to not submitting the SAT results, and Plaintiff cannot fault UNE for considering what he submitted when the choice was his.

Moreover, it is plain that Defendant used the SAT only in addition to a number of other criteria, including specifically an *untimed* reading test. None of those other criteria suggested that Plaintiff was a qualified applicant, and the untimed test, on which Plaintiff received the lowest possible score, showed him to be patently unqualified.

used not only its regular criteria, but also untimed tests and performance in previous special programs for the learning disabled. The record shows that UNE made reasonable accommodations in its admissions process for learning disabled students like Plaintiff.

█ Along with the materials required for his application, Plaintiff submitted a letter telling the UNE admission officers not to consider his grades at previous institutions or his bad standardized test scores because they were not representative of his abilities. Rather he sought to be allowed to enroll at UNE "and prove that I can do the work." Halasz Dep.Ex. 6. Plaintiff, therefore, sought to have UNE abandon all criteria for admissions. Section 504 clearly does not require that an educational institution lower its admissions standards to accommodate the handicapped. *Wynne,* 976 F.2d at 793.

In *Alexander v. Choate,* 469 U.S. 287, 301, 105 S.Ct. 712, 720, 83 L.Ed.2d 661 (1985), the Supreme Court articulated the reasonable accommodation requirement under section 504:

> The balance struck in *Davis* requires that an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers. The benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled; to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made.

Here the benefit sought by Plaintiff is admission to Defendant's regular baccalaureate program. Defendant has provided meaningful access to the benefit for learning disabled students like Plaintiff. Plaintiff is not "otherwise qualified" for admission to UNE and is not, therefore, entitled to relief under section 504.

U.N.E. has submitted undisputed facts that its officials provided even further accommodation to learning disabled students who have not shown themselves to be qualified for regular admission to the baccalaureate program. The FYO program, which provides services, support, and remedial attention to students like Plaintiff, allows them the opportunity to be regularly matriculated upon successful completion of two semesters of the FYO program. Earning a GPA of 2.0 or better in a reduced load of college-level courses and obtaining the recommendation of the faculty demonstrates a disabled student's capabilities after accommodation has been made for his or her disabilities.[7]

In Count I Plaintiff also alleges that after his participation in the FYO program, Defendant did not allow him to matriculate in the baccalaureate program and dismissed him on the basis of higher academic standards than those imposed on nonhandicapped students. The undisputed facts submitted by Defendant show that matriculation into the regular program from the FYO program required a GPA of 2.0 over two consecutive regular semesters, while regularly matriculated students were required to maintain only a GPA of 1.7 to remain in good academic standing. For regularly matriculated students, grades from the short winter term were considered in determining the GPA, while they were not considered for purposes of determining if FYO students could matriculate.

The undisputed facts also show a rationally justifiable academic reason for these distinctions. In her affidavit, U.N.E. admissions officer Patricia Cribby stated:

> The purpose of the FYO program was to provide an opportunity for non-qualified learning disabled applicants to become qualified for matriculated status at U.N.E. By contrast, matriculated students have already demonstrated through the initial admission process that they are qualified for admission and that they possess the academic abilities and other relevant qualifications for successful participation in U.N.E.'s baccalaureate program. Whereas FYO students generally take only three college-level credit hours per semester,

---

**7.** Section 504 does not require colleges to establish programs like the FYO to facilitate admission to college of those who with other reasonable accommodation for their handicaps have not shown themselves to be qualified for regular admission. *Southeastern Community College v. Davis,* 442 U.S. 397, 410–12, 99 S.Ct. 2361, 2369–70, 60 L.Ed.2d 980 (1979).

matriculated students generally take twelve to eighteen college-level credit hours per semester. Affidavit of Patricia Cribby, ¶ 33. Thus, Defendant requires a higher grade point average for the FYO students who are taking fewer courses to make sure that they are qualified for the regular program which will require them to take many more college level courses and course hours per semester. Were the GPA requirement not higher for the FYO students, Defendant would have run the risk of lowering academic standards in the regular program by admitting students who would not be able to cope when faced with the necessity of taking a full load of college-level courses. The record discloses, however, that even if Plaintiff had only been required to maintain a 1.7 GPA, he would have failed to meet it with his GPA of 1.375.

Ms. Cribby's affidavit also discloses a rationally justifiable pedagogical basis for the decision to exclude winter term courses from the calculation of FYO students' GPAs while including them to determine the academic standing of regularly matriculated students. First, the winter term courses vary greatly in the level of difficulty and the intensity of the required study. *Id.* ¶ 35. Defendant looks to the success of the FYO students in their college level courses, while they are receiving special assistance for their disabilities, to predict whether they will be successful students in the baccalaureate program if provided with adequate support. Courses that are not necessarily comparable to the majority of courses in the curriculum cannot have that predictive value. The winter term is part of the regular curriculum, however, and its courses are used to evaluate regularly matriculated students who, in contrast to FYO students, have previously demonstrated academic qualification for U.N.E. admission.

Plaintiff complains that the accommodations made for him in the FYO program were not adequate and that he would have been more successful in the program with better accommodations. For example, he argues that he requested the assistance of notetakers, but that his request was resisted by UNE. He also complains that the academic counseling he received from his learning specialist was inadequate, that he was provided with inadequate readers in lieu of taped texts and that his tutors were of poor quality.

The undisputed facts show that Plaintiff was offered the same wide array of accommodations which had been offered previously to other learning disabled students in the FYO program and which had enabled them to matriculate successfully in the baccalaureate program at the end of the year. Although the regulations promulgated under section 504 require academic institutions to provide auxiliary aids to handicapped students, 34 C.F.R. § 142.44(d), Plaintiff was not entitled to "devices or services of a personal nature," 34 C.F.R. § 142.44(d)(2). The Court finds, therefore, that even after reasonable accommodation was made for Plaintiff's handicaps, he was not "otherwise qualified" for admission to UNE's baccalaureate program, and the university did not discriminate against him by dismissing him after his FYO year. *See Wynne*, 976 F.2d at 792–93. Summary judgment is, therefore, appropriate for Defendant on Count I.

### B. Count II

In Count II Plaintiff alleges that UNE, in violation of section 504, discriminated against him by forcing him to obtain his reasonable accommodations through the ILP and by charging unreasonable amounts for those accommodations. Section 504's protections against discrimination on account of handicap are afforded only to individuals who, except for their handicaps, are "otherwise qualified" for the benefit to which they seek access. 29 U.S.C. § 794. Since Plaintiff was not "otherwise qualified" for admission to UNE, he may not recover under section 504 for any alleged discrimination occasioned by the structure, administration, or cost of the accommodations provided by UNE to its learning disabled students.[8] The

---

8. Plaintiff argues that he was "otherwise qualified" for the FYO program and that the charges for the services in that program discriminated against him on the basis of his handicap. The FYO program, however, was open only to handicapped students like Plaintiff. Section 504 provides that "no otherwise qualified individual with handicaps ... shall solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to

cases cited by Plaintiff in support of his argument are inapposite because in them the handicapped individuals seeking relief were already enrolled in the programs for which they were seeking the reasonable accommodations and thus "otherwise qualified" and entitled to such adjustments under section 504. *See United States v. Board of Trustees for the University of Alabama*, 908 F.2d 740, 742 (11th Cir.1990); *University of Arizona*, 2 NDLR ¶285, at 1059 (Decision of Office for Civil Rights, Department of Education).

## C. Count III

Count III seeks recovery under section 504 for UNE's failure to provide reasonable accommodations to Plaintiff. Plaintiff alleges that the accommodations provided him were costly and inadequate. As discussed above, under *Wynne* the Court is required to consider an institution's reasonable accommodations of Plaintiff's handicap in determining whether an aspiring student meets section 504's "otherwise qualified" prong. The Court, therefore, has already addressed some of the issues raised by Plaintiff in this Count. Because the Court determined in the context of the reasonable accommodations provided that Plaintiff was not an "otherwise qualified individual," he is not entitled to recover under section 504 for the alleged inadequacy of the accommodations provided by UNE.[9]

## D. Count IV

■ In Count IV Plaintiff alleges that Defendant failed to provide sufficient notice to its students and applicants both of its obligations under section 504 and about their rights concerning pre-admission inquiries by Defendant about their handicaps. The regulations implementing section 504 require a

university to take "appropriate initial and continuing steps to notify" applicants and program participants that it "does not discriminate on the basis of handicap in violation of section 504.... The notification shall also include an identification of the responsible employee designated pursuant to § 104.-7(a)." 34 C.F.R. § 104.8. Section 104.7(a) requires a university receiving federal funds to designate a person to coordinate its efforts to comply with the statute. UNE's catalog provides notice that it does not discriminate on the basis of handicap. It does not name the employee designated by the university to coordinate its efforts under the statute. Plaintiff argues that "if UNE had designated the required coordinator and notified Plaintiff as to his identity Plaintiff's concerns about Defendant's treatment of him might have been resolved long ago," and that a coordinator would presumably have assured that UNE was in compliance with the law. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, at 12.

The Court has not found any guidance on the application of this particular regulation. Plaintiff has not, however, shown that he was harmed in any way by the failure of UNE to publish the name of its Rehabilitation Act coordinator. His argument that if he had known of the coordinator, he might have resolved his complaints sooner is specious, since the Court has found no basis for his complaints of discrimination, and there is no showing that UNE is in violation of its substantive obligations under the Act. While the failure to include the name of the coordinator in its notice of its nondiscrimination policy constitutes a technical violation of the regulation, the Court finds that without a

---

discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794. Clearly, since the benefits of the FYO program are available only to handicapped individuals, Plaintiff is not being excluded from participation in them or being denied them solely because of his handicap. Moreover, once a university decides to offer a program, like the FYO, which is not a reasonable accommodation to the handicapped, but a separate program for disabled individuals, section 504 cannot reasonably be read to require that the university cannot charge for this program.

9. The Court notes that some of Plaintiff's specific complaints do not appear to have merit. For example, he complains about the adequacy of the provision of notetakers. The record shows, however, that UNE initially denied plaintiff notetakers so he could see if his own skills were adequate. At the same time it provided him with carbon paper so he could collect the notes of other students of his choice. Although Plaintiff claims it was too late, a notetaker was provided for his fall semester course. The record shows a *rationally justifiable pedagogical reason* for the method of providing notetakers to Plaintiff.

showing of harm flowing from the violation, Plaintiff is entitled to no relief. *See Doe v. Alabama State Dept. of Education,* 915 F.2d 651, 660–62 (11th Cir.1990) (discussing regulations promulgated under the Education of the Handicapped Act, 20 U.S.C. §§ 1401–61).

■ Plaintiff also complains that UNE violated 34 C.F.R. § 104.42(b)(4) which provides that in administering its admissions policies, a recipient of federal financial aid "may not make preadmission inquiry as to whether an applicant for admission is a handicapped person, but after admission, may make inquiries on a confidential basis as to handicaps that may require accommodation." In this case, the record discloses that Plaintiff called UNE precisely because it had a program for the learning disabled and that in his initial contact with the university, he inquired about the ILP program and volunteered information about his handicap. Plaintiff argues that these facts in no way affect Defendant's obligation not to inquire about his handicap. That position is untenable.

UNE's application form does not require a handicapped applicant to disclose his or her handicap. If the applicant wishes to be considered for UNE's ILP program, which is available only to the learning disabled, he or she may indicate that on the form. As discussed above, not all learning disabled students at UNE participate in the ILP.

When a university operates a program specifically for the handicapped, it clearly needs to know about an applicant's handicaps before it can make a decision about admission to the program, for the program may be appropriate for some handicapped individuals and not for others. Section 504 is designed in part to assure that handicapped applicants and students are not, because of their handicaps, denied the benefits of programs offered by federally subsidized universities to non-handicapped students. None of the purposes of the statute would be served by enforcing the inquiry prohibition when a university offers a program available only to handicapped students and a handicapped person seeks to participate in that program.

Here, Plaintiff did not check the ILP box on the application form. His telephone inquiry, voluntary provision of information about his handicap, and letter seeking recognition of his handicapped status, however, made it clear that he was interested in UNE's special program for the learning disabled. Certainly, UNE could only tell if Plaintiff could benefit from the ILP or FYO programs for the learning disabled by seeking information about his handicaps. The Court finds, therefore, that under the circumstances presented here UNE did not violate the above-cited regulation by requiring Plaintiff to provide information about his handicaps before being admitted to the FYO program.

Accordingly, it is ORDERED that Defendant's Motion for Summary Judgment be, and it is hereby, GRANTED on all counts of the complaint.

SO ORDERED.