MEMORANDUM OPINION
 

 MICHAEL, Senior District Judge.
 

 This matter comes to the court upon Plaintiff Robert W. Betts’ motion for a preliminary injunction ordering Defendants Rector and Visitors of the University of Virginia— effectively the University of Virginia (“University”) — to admit plaintiff into the University Medical School’s 1996 entering class (with courses commencing on August 19, 1996).
 
 [1]
 
 Plaintiff has filed this suit pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101
 
 et seq.
 
 (“ADA”), the Rehabilitation Act, 29 U.S.C. § 701
 
 et seq.,
 
 42 U.S.C. § 1983, and Virginia state law. Plaintiff claims that the University violated the ADA the Rehabilitation Act, his constitutional rights of procedural and substantive due process under the Due Process Clause of the Fourteenth Amendment, and the terms of an alleged contract between the defendants and plaintiff. For the reasons stated below, the court denies plaintiffs motion for a preliminary injunction.
 

 I.
 

 The parties largely agree on the facts, with minor exceptions. Plaintiff was accepted into the University of Virginia’s Medical School pursuant to the Medical Academic Advancement Post-Baccalaureate Program (“MAAP”), designed for economically disadvantaged and minority students. MAAP guaranteed admission to the University’s Medical School to selected applicants who, inter alia, completed the program and maintained a minimum GPA of 2.75 per semester, received no grade below a C, and met the requirement of “[sjatisfactory performance”
 
 *464
 
 to “be judged by the faculty [committee] of the MAAP[ ] program.” PL’s Compl., Exhibit 2. Plaintiff began the program in the summer of 1995, and continued in the program during the fall semester. He failed to maintain the requisite GPA (he attained a 2.223), and he received a grade below a C in physics (he received a D-). Nonetheless, the faculty committee decided to permit plaintiff to proceed under a modified set of requirements. The faculty committee notified plaintiff that if he accepted tutoring and submitted to testing for a learning disability, he would be permitted to continue, pending reevaluation of his performance by the faculty committee at the end of the academic year. PL’s Compl., Exhibit 4. Plaintiff agreed.
 

 Pursuant to the agreement, plaintiff was examined by the University Learning Needs and Evaluation Center (“LNEC”), which issued a preliminary letter to plaintiffs professors on April 12, 1996, stating that plaintiff had “difficulties with short-term memory [and] reading speed.” It recommended that plaintiff be given double time for all examinations. PL’s Compl., Exhibit 6. An official report that followed on June 27,1996, did not diagnose plaintiff with a specific learning disability, but found that plaintiff “had high average verbal conceptual skills and average intellectual ability,” but showed “significant weaknesses in particular patterns of abilities.” LNEC concluded that plaintiff lacked “adequate strategies when information exceeded] the storage capacity of his short term memory,” and that he “demonstrated a pattern of uneven cognitive processing skills consistent with a mild learning disability.” LNEC again recommended that plaintiff receive double time for all exams. Defs.’s Motion, Attachment Two.
 
 [2]
 
 Upon receiving the April 12, 1996 letter, the University immediately doubled the allotted time plaintiff was previously permitted on exams, and he took five exams with the enlarged time; on these five exams, plaintiff received grades in the A or B range. In the spring semester, however, plaintiff achieved only-a 2.838 GPA, which gave him a cumulative GPA of 2.531 for the year. The other MAAP participants attained the following GPAs for, respectively, the spring and the year: 4.0, 3.4, 3.3, 3.5, 3.6, and 4.0; 3.9, 3.5, 3.2, 3.6, 3.6, and 3.8. On May 28, 1996, the faculty committee met and decided that plaintiff had failed to demonstrate that he was prepared to enter medical school and his offer of admission was rescinded. Plaintiff was informed that his “failure to meet the overall GPA standard of 2.75 for the academic year” was the reason for the decision of the faculty committee to rescind its offer of admission.
 
 [3]
 
 PL’s Compl., Exhibit 7. Plaintiff appealed to the Dean of the Medical School Robert M. Carey (as he was told he could), and was apprised on June 10, 1996, that the faculty committee’s decision would be upheld. Plaintiff, with his counsel, was given an additional opportunity to appear before Dean Carey, the Admissions Director Beth A. Bailey, and Associate Dean for Admissions Benjamin C. Sturgill. During that meeting (on August 6,1996), plaintiff was offered yet another chance to enter into the Medical School (albeit not before the fall of 1997),
 
 [4]
 
 on newly revised terms.
 
 [5]
 
 Instead
 
 *465
 
 of accepting the offer, plaintiff filed this lawsuit on August 9, 1996, and filed his motion for a preliminary injunction on August 14, 1996 (upon which a hearing was conducted on August 15, 1996), seeking entry into the Medical School on August 19,1996.
 
 [6]
 

 Plaintiff requests that this court grant him declaratory relief stating that defendants have violated the ADA, the Rehabilitation Act, and the Due Process Clause, and that defendants have breached a contract between themselves and plaintiff. Plaintiff also seeks preliminary and permanent injunctive relief requiring defendants immediately to reinstate plaintiff into the 1996-1997 Medical School class and requiring defendants to reinstate plaintiffs financial aid, which he received as a MAAP participant. Finally, plaintiff asks for costs and attorney’s fees pursuant to the ADA and 42 U.S.C. § 1988. The only issue before the court today, however, is whether preliminary injunctive relief is warranted in this case.
 

 II.
 

 Plaintiffs motion for a preliminary injunction is governed by the test articulated in
 
 Blackwelder Furniture Co. v. Seilig Manufacturing Co.,
 
 550 F.2d 189, 196 (4th Cir. 1977), pursuant to which the court must take into account four factors, the weight given to each to be determined by the strength of the other factors. First, the court must make a finding that plaintiff will suffer irreparable injury if the court declines to grant injunctive relief. After this determination has been made, the court must assess the likelihood of harm to the defendant if the court issues an injunction against him and then balance this harm against the injury the plaintiff will suffer if he is denied injunctive relief. Subsequently, the court must establish that the plaintiff is likely to succeed on the merits, or if the .balance in the previous step clearly favors the plaintiff, the court need only satisfy itself that the plaintiff has raised substantial and serious questions on the merits. Finally, public interest must be considered in the analysis.
 
 Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,
 
 22 F.3d 546, 551 (4th Cir.1994) (quoting
 
 Direx Israel, Ltd. v. Breakthrough Medical Corp.,
 
 952 F.2d 802, 812-13 (4th Cir.1991)). “Where serious issues are before the court, it is a sound idea to maintain the
 
 status quo ante
 
 litem____”
 
 Feller v. Brock,
 
 802 F.2d 722, 727 (4th Cir.1986) (citing
 
 Blackwelder,
 
 550 F.2d at 194-95). When the injunction that would alter the status quo is mandatory (as opposed to prohibitory), the district court should “sparingly exercise[]” its authority.
 
 Wetzel v. Edwards,
 
 635 F.2d 283, 286 (4th Cir.1990). “Indeed, granting a preliminary injunction requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way. ‘[T]he danger of a mistake’ in this setting ‘is substantial.’”
 
 Hughes Network Systems v. InterDigital Communications Corp.,
 
 17 F.3d 691, 693 (4th Cir.1994) (quoting
 
 American Hosp. Supply Corp. v. Hospital Prods., Ltd.,
 
 780 F.2d 589, 593 (7th Cir.1986)).
 

 A.
 

 The court is generally persuaded by the Second Circuit’s conclusion that “[o]rdinarily a one-year delay in obtaining admission to a graduate school for the purpose of pursuing professional studies, as distinguished from interruption or termination of attendance already in progress, is insufficient to warrant an injunction in the absence of other circumstances militating in favor of such relief.”
 
 Doe v. New York University,
 
 666 F.2d 761 (2d Cir.1981) (citations omitted). The court finds no extraordinary circumstances in this ease, keeping in mind that “ ‘[t]he
 
 possibility
 
 that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.’ ”
 
 Hughes,
 
 17 F.3d at 694 (quoting
 
 Sampson v. Murray,
 
 415 U.S. 61, 90, 94 S.Ct. 937, 953, 39 L.Ed.2d 166 (1974) (internal quotations and citations omitted) (emphasis added)). Plaintiff urges that he will be irreparably injured because, apparently, the University is discontinuing MAAP
 
 *466
 
 after this academic year, and, consequently, he will not be able to apply to the University’s Medical School through MAAP again. The University has made plaintiff an offer, however, which gives him an opportunity to enter into its Medical School with significantly relaxed requirements,
 
 [7]
 
 hence, the discontinuation of MAAP compels no finding of irreparable injury. Even if the University had not made an offer to plaintiff, the court’s conclusion would be no different; this is because if a subsequent decision on the merits revealed that plaintiff had been wrongly denied entry into the Medical School, the court could simply order his reinstatement. Nonetheless, plaintiff insists that even if he is accepted to the University’s Medical School without MAAP, he will lose the financial aid to which MAAP entitles him, and lacking aid, plaintiff claims, he will be unable to attend the Medical School. Although the matter would be entirely free from doubt if the University had included in its offer to plaintiff a guarantee of financial aid, the University’s failure to make any such promise does not suggest that aid will be unavailable to plaintiff. Generally, students who demonstrate need can receive financial aid from the University to sustain their educational expenses. If, as plaintiff asserts, he is in need of financial aid, and is able to satisfy the requirements applicable to the financial aid program, it appears from representations of defendants’ counsel at oral argument that he will receive it. Finally, plaintiff complains of psychological injury and stigma associated with being held back while his MAAP peers enter the Medical School. While it very well may be that plaintiffs peers have labeled him a “slow learner,” a court order directing the University to admit plaintiff will likely not erase his classmates’ perceptions. If other students believe plaintiff to be somehow inferior to themselves because of his poor academic performance, it is doubtful that this court’s command that he enter the Medical School will alter their view, since the court cannot expunge plaintiffs academic record. Even if a court order could persuade the other students, however, this factor would not be sufficient to warrant injunctive relief, because any stigmatic effect that could be avoided must be considered in light of the other
 
 Blackwelder
 
 factors, the majority of which cut against plaintiff.
 

 B.
 

 1. ADA AND THE REHABILITATION ACT CLAIMS
 

 Of all of plaintiffs claims, those under the ADA and the Rehabilitation Act present the most serious issues. Because of the great substantive similarity between the ADA and the Rehabilitation Act,
 
 see Doe v. University of Maryland Medical System Corp.,
 
 50 F.3d 1261, 1264 n. 9 (4th Cir.1995), it is appropriate for them to be discussed together. Title II of the ADA provides as follows:
 

 Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity or be subjected to discrimination by any such entity.
 

 42 U.S.C. § 12132.
 

 Section 504 of the Rehabilitation Act states as follows:
 

 No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.
 

 29 U.S.C. § 794(a).
 

 To state a cause of action under Title II of the ADA or § 504 of the Rehabilitation Act, plaintiff must show (1) that he has a disability; (2) that he is an otherwise qualified individual; and (3) that he was denied the benefit at issue on the basis of his disability.
 
 [8]
 

 Maryland Medical System,
 
 50 F.3d at 1264-65. Probably on a determination of the mer
 
 *467
 
 its, plaintiff would be able to satisfy the first and third criteria. “Disability” is very broadly defined by the ADA, 42 U.S.C. § 12102(2),
 
 [9]
 
 and the Rehabilitation Act, 29 U.S.C. § 760(7)(B).
 
 [10]
 
 Given (1) that the University itself has determined that plaintiffs needs warrant a doubling of the time in which he takes examinations, (2) the findings of the LNEC, and (3) the affidavit of the independent clinical psychologist retained by plaintiff (attesting to plaintiffs learning disability),
 
 [11]
 
 in a proceeding on the merits, plaintiff likely could establish that he is disabled under the ADA and the Rehabilitation Act. As to the requirement that plaintiff show a detriment based on his disability, in all likelihood he would be able to make such a showing on the merits. Clearly, if it is found that plaintiffs poor performance resulted from a learning disability, he will have satisfied this criterion, since the University has admitted that plaintiff was denied entry because of his poor performance.
 

 The stumbling block for plaintiff lies in showing that he is qualified to attend the University’s Medical School. Under the Rehabilitation Act, an “otherwise qualified” individual is “one who is able to meet all of a program’s requirements in spite of his handicap.”
 
 Southeastern Community College v. Davis,
 
 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979). The ADA similarly defines a “qualified individual with a disability” as one who “meets essential eligibility requirements ... for the participation in [a given] program[ ] ... provided by a public entity” “with or without reasonable modifications to rules, policies, or practices.” 42 U.S.C. § 12131(2). Plaintiff urges that the five examinations which he took after the University doubled his allotted time demonstrate his qualifications to attend the Medical School.
 

 Although rather different from the case at bar, the court finds the Second Circuit’s opinion in
 
 New York University
 
 (discussed above) instructive. In that case, the plaintiff was accepted into medical school after misrepresenting that she suffered from no mental problems. Actually, she was plagued with various mental disorders. The medical school subsequently determined that the plaintiff had severe psychological problems and could remain in medical school only if she agreed to undergo therapy. She agreed, but various problems ensued, and ultimately the medical school requested her to leave and refused to readmit the plaintiff. The plaintiff filed suit, seeking preliminary injunctive relief pursuant to the Rehabilitation Act, which the district court granted. The Second Circuit reversed, reasoning as follows:
 

 In determining whether a handicapped person is “otherwise qualified” for admission to an institution of higher education, a court must also consider other factors not normally encountered in evaluating ability to satisfy employment standards or to qualify for a job. The first of these is a court’s limited ability, as contrasted to that of experienced educational administrators and professionals, to determine an applicant’s qualifications and whether he or she would meet reasonable standards for academic and professional achievement established by a university____ “Courts are particularly ill-equipped to evaluate academic performance.”
 
 Board of Curators of University of Missouri v. Horowitz,
 
 435 U.S. 78, 92, 98 S.Ct. 948, 956, 55 L.Ed.2d 124 (1978). For this reason, although the [Rehabilitation] Act requires [the court] rather than the institution to make the final determination of whether a handicapped individual is “otherwise qualified,” ... considerable judicial deference must be paid to the evaluation made by the institution itself, absent proof that its standards and its application of them serve no purpose other than to deny an education to handicapped persons.
 

 
 *468
 
 666 F.2d at 775-76;
 
 [12]
 
 see
 
 Wood v. President and Trustees of Spring Hill College,
 
 978 F.2d 1214, 1222 (11th Cir.1992) (citing
 
 New York University
 
 with approval).
 

 In this case, plaintiff makes no argument — nor could he — that the University has any intention of discriminating against disabled or handicapped persons. It is equally clear that the University has not established its standards, or applied those standards, with the purpose of denying benefits to disabled or handicapped persons. Instead, the University concluded, upon examining plaintiffs record, that plaintiff could not enter into its Medical School because he was unprepared or, in other words, unqualified. While plaintiffs performance did improve with the University’s reasonable modification (doubling of plaintiffs exam time), the University had to weigh five exams that showed this improvement against a much lengthier, and substantially poorer, record. On a full decision on the merits, it is highly improbable that plaintiff could demonstrate — with five improved examinations, overshadowed by a fall GPA of 2.223, a spring GPA of 2.838, and a cumulative GPA of 2.531
 
 [13]
 
 — that he is otherwise qualified or that he can function in the Medical School with or without reasonable modifications. As the University argues, with reasonable modifications plaintiff
 
 might
 
 be qualified; at this stage, however, the available evidence indicates that probably he is not. Because plaintiff must make such a showing under both the Rehabilitation Act and the ADA, and it is doubtful that he would be able to do so, plaintiff probably will not succeed on the merits of his claims under either the Rehabilitation Act or the ADA
 
 [14]
 

 2. PROCEDURAL AND SUBSTANTIVE DUE PROCESS CLAIMS
 

 Plaintiff next claims that even if there was no violation of the ADA and the Rehabilitation Act, the University violated his constitutional rights to procedural and substantive due process guaranteed by the Due Process Clause of the Fourteenth Amendment.
 

 Plaintiff’s claim asserting procedural due process rights is governed by
 
 Board of Curators of the University of Missouri v. Horowitz,
 
 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978), and its progeny. In
 
 Horowitz,
 
 the Supreme Court declined to address the question whether any constitutionally protected interest (liberty or property) was infringed by a student’s dismissal from medical school, but assumed that it was. The Fourth Circuit has not directly addressed the issue, although it too assumed the existence of such an interest.
 
 See Henson v. Honor Committee of U. Va.,
 
 719 F.2d 69, 73 (4th Cir.1983);
 
 Lewin v. Medical College of Hampton Roads,
 
 910 F.Supp. 1161, 1164 (E.D.Va.1996) (citing cases). The stan
 
 *469
 
 dard adopted by the Fourth Circuit for evaluating whether there has been a denial of procedural due process depends to some degree on whether the challenged action involves an objective or subjective inquiry.
 
 Siu v. Johnson,
 
 748 F.2d 238, 244 (4th Cir. 1984). The standard for the latter type of decisionmaking is substantially relaxed. All that is necessary to ensure that a plaintiff has received constitutionally required process is a finding that the decision “was not so arbitrary and capricious that a reviewing court can confidently say of it that it did not in the end involve the exercise of professional judgment.”
 
 Id.
 
 at 245.
 
 [15]
 

 Plaintiff makes the argument that his dismissal involved the evaluation of a single objective criterion, specifically whether he attained a 2.75 GPA or better. This assertion simply cannot be supported. From the outset, plaintiff was informed that his admission into the Medical School was dependent upon the satisfaction of the faculty committee. When it modified the criteria plaintiff would have to satisfy to remain in MAAP, the University reiterated that the faculty committee would retain the discretion to rescind its offer of admission if it was dissatisfied with plaintiffs performance. Moreover, according to defendants, the reason plaintiff was denied admission into the Medical. School was that the faculty committee “judged [his] academic performance to be insufficient for entry into medical school.” Defs.’s Motion, Affidavit of Ms. Bailey. When the faculty committee informed plaintiff that its decision was based on his failure to meet an overall GPA of 2.75, this decision reflected the subjective professional judgment of the faculty committee that students performing below that level were incompetent to attend the Medical School.
 

 Plaintiff further contends that even if the faculty committee’s decision was subjective, it was also arbitrary and capricious, because it supposedly imposed a new and unexpected criterion on plaintiff. This is not a tenable argument, even making the assumption,
 
 see supra
 
 note 3, that the specific criterion was not previously made known to plaintiff. A judgment that a medical student should be able to maintain a 2.75 GPA or better is far from arbitrary or capricious; given the great responsibility shouldered by the medical profession, it should hardly surprise anyone — including plaintiff — that grades dangerously close to the C range are unacceptable. Moreover, plaintiffs grades were far below those of all other MAAP participants, none of whom received an average GPA below 3.2 cumulatively, or during the spring semester alone.
 

 The same reasoning that compels the conclusion that plaintiff would not be able to establish a violation of procedural due process on the merits, applies with equal force to his substantive due process claim. Under
 
 Regents of the University of Michigan v. Ewing,
 
 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985), substantive due process concerns are raised only by a decision that is “such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.”
 
 Id.
 
 at 225, 106 S.Ct. at 513. Otherwise, “[plainly, [courts] may not override [an academic decision].”
 
 Id.
 
 For the reasons stated in connection with plaintiffs procedural due process claim, defendants made no departure from accepted academic norms.
 

 3. STATE LAW BREACH OF CONTRACT CLAIM
 

 Plaintiffs last theory for recovery is a pendent Virginia state law breach of con
 
 *470
 
 tract claim. Citing various cases (none from Virginia), plaintiff argues that an offer by a university followed by acceptance by a student creates a binding contract between the parties. Although plaintiff concedes that the University would have been justified in rescinding its offer to plaintiff when he failed to meet the minimum GPA requirement for the fall semester (and received a D - in physics), plaintiff argues that the University waived this requirement when it permitted plaintiff to continue in MAAP. Further, plaintiff insists that there was never a requirement that he maintain a 2.75 average for the year, but only per semester, and he met this requirement in the spring semester when he attained a 2.838.
 

 For purposes of deciding this issue, the court will put aside the fact that a required average of 2.75 per semester ineluctably leads to a required average of 2.75 for the year, which plaintiff did not attain. Assuming there never was a minimum GPA requirement for the year, or, alternatively, assuming that the University waived any such requirement by permitting plaintiff to remain in MAAP despite his failure to attain the 2.75 GPA in the fall, the court still cannot make a finding that the University breached any alleged contract with plaintiff. This is because the University specifically reserved the right to deny plaintiff entry into the Medical School upon reevaluation by the faculty committee and its judgment that plaintiff was prepared for the Medical School. The University did not deviate from its promised course of action. Given the express reservation by the University and subsequent action consistent with the reservation, it is most doubtful that plaintiff could prevail on the merits of his breach of contract claim against the University.
 

 C.
 

 There remains the question of public interest. The public has an interest in seeing that the various statutory provisions enacted for the benefit of the handicapped or disabled are faithfully followed, so as to prevent discrimination against the disabled generally and against plaintiff here, particularly. Of course, the public also has an interest in the enforcement of constitutional rights and state contract laws.
 

 There is a public interest, on the other hand, in preserving unfettered academic responsibility for appropriate academic decisionmaking, both as to admission policies, as in this case,, and as to the myriad other academic decisions which must be made in the academic operation of a university, whether generally for the institution or, as in this case, for admission to a medical school. Considering the long range effects of authorizing individuals to enter into the practice of medicine following graduation and given the circumstances of this case, a greater public interest inheres in assuring, by academic decision, the competency of medical school graduates.
 

 While not necessary to resolution of the immediate issue herein addressed, there is lurking in this case a more fundamental question. That question is what, in the academic circumstance, is a “reasonable modification.” Considering “reasonable modification” in the usual employment setting is relatively straightforward. Modification of work stations, etc., presents relatively little analytical difficulty. The academic setting, however, brings strongly into play factors far removed from work station changes.
 

 In the academic setting, the most difficult question arises in defining “reasonable modification.” Academic standards are set by the institutions, and involve the classic example of the exercise of the academic function. Is the elimination or relaxation of one or more of those standards a “reasonable modification” for the needs of a disabled person? If a “relaxation” of such a standard must be measured against a reasonableness test, the court is then required to make a decision relating to or dealing with an academic standard. Being projected into that position is contrary to the various case law directions cautioning trial courts against such intrusion in academic matters. Almost inevitably the argument will be made that the relaxation is reasonable, though it is in fact a diminution of the standard affected. Only by entering into this proscribed territory can a court resolve this issue. In the case at bar, it may be that this will not arise as an issue, since
 
 *471
 
 the defendants have acquiesced in a program of double time for plaintiffs examinations. It is by no means certain that the issue will not arise here, but it appears unlikely because of that acquiescence. In providing the double time arrangement for plaintiff, the University effectively is measuring his performance by a lower standard. Is this a “reasonable modification”? To determine the answer to that question, is the court then required to enter into the academic thicket? Such questions pose difficult problems for this court.
 

 D.
 

 Given the court’s finding (1) that plaintiff will not suffer irreparable injury, (2) that plaintiff has little chance of success on the merits, and (3) that public interest favors denial of a preliminary injunction, it should be clear that a preliminary injunction should not issue in this case. Nonetheless, for the sake of completeness, the court notes that throughout its analysis it has assumed that the balance of harms favors plaintiff in this case. Still, this lone factor, of course, is insufficient to overcome all of the other considerations, discussed above. Therefore, the court denies plaintiffs motion for a preliminary injunction.
 

 Reviewing the foregoing opinion originally submitted on August 16, 1996, the following aphorism, thought to be attributed to Benjamin Disraeli, comes to the court’s mind: “If I had more time, I’d write a shorter letter.”
 

 An appropriate Order shall this day issue.
 

 ORDERED
 

 that the Memorandum Opinion entered by this court on August 16,1996, shall be, and it hereby is, withdrawn. The Memorandum Opinion accompanying this Order shall be substituted for the August 16, 1996 Memorandum Opinion. The judgment of the court pursuant to the August 16, 1996 Memorandum Opinion and underlying Order is not affected by the substitution of the previous Memorandum Opinion.
 

 [1]
 

 . The court’s analysis is hampered by the fact that plaintiff filed his complaint on August 9, 1996, and filed his motion for a preliminaiy injunction on August 14, 1996, giving this court and defendants precious little time to analyze plaintiff's claims before the hearing on August 15, 1996. It was essential to conduct the hearing immediately because the com! was advised that the entering class of the Medical School would begin on August 19, 1996.
 

 [2]
 

 . Plaintiff subsequently obtained independent evaluation by a doctor who has purportedly found that plaintiff has a learning disability.
 

 [3]
 

 . Plaintiff persistently emphasizes that there was no requirement that he maintain a 2.75 average GPA for the year; he insist that the requirement (if in force) only applied to individual semesters. But, if there is a requirement of 2.75 in the fall, and 2.75 in the spring, inevitably (by the power of mathematics) there is a minimum requirement of 2.75 per year. Even if a directive from the court could trump mathematics, plaintiff ignores the fact that pursuant to the modified agreement with plaintiff, the faculty committee reserved the right to reject his application upon reevaluation, and after reviewing plaintiff's performance, the faculty committee found plaintiff unprepared for the Medical School based on his failure to achieve a minimum GPA of 2.75.
 

 [4]
 

 . Plaintiff claims that this was, in essence, a settlement offer, but defendants claim to the contrary. The burden on this issue rests with plaintiff, and he has not offered any evidence that rebuts defendants’ representation (during oral argument on August 15, 1996) that the offer was a continuing step in the appeals process.
 

 [5]
 

 . Essentially, plaintiff would be required to (1) take an additional twelve credits of course work, in which the University offered to support any request plaintiff made for double time; (2) retake the Medical College Aptitude Test ("MCAT”) (again, using double the time allotted non-disabled students if possible); and (3) attain a GPA
 
 *465
 
 of 3.25 or better, receive no grade lower than C, and achieve an average score of 8 on the MCAT, with no individual score falling below 7.
 

 [6]
 

 . The Medical School has 139 openings, all of which are currently full.
 

 [7]
 

 . For instance, the average medical student at the University has an MCAT score of 10; plaintiff is required to score an average of only 8 (with double time) pursuant to the University's offer. Defs.'s Motion, Affidavit of Ms. Bailey.
 

 [8]
 

 . The court assumes that the ADA and the Rehabilitation Act apply to the University.
 

 [9]
 

 . The ADA defines disability as “a physical or mental impairment that substantially limits one or more of the major life activities of [an] individúale,] ... a record of such impairment!)] or ... being regarded as having such an impairment.” § 12102(2).
 

 [10]
 

 . The Rehabilitation Act includes within its definition of "handicapped individual" precisely the same individuals covered by the ADA’s definition of disability. § 706(7)(B).
 

 [11]
 

 . Plaintiff has produced his own affidavit asserting his past record of learning problems.
 

 [12]
 

 . Subsequent to oral argument, the court uncovered this case, which expresses and addresses the concerns the court voiced from the bench regarding the potential conflict between the ADA and the Rehabilitation Act on the one hand, and academic freedom on the other hand.
 

 [13]
 

 . One requirement of the MAAP program was the achievement of MCAT scores satisfactory to the faculty committee. While the faculty committee did not consider plaintiff's MCAT scores in their initial decision because the scores did not become available until June 1996, the scores' plaintiff received are a consideration at this stage for the University. Defs.’s Motion, Affidavit of Ms. Bailey. Plaintiff's scores were extremely low, and far below those of the average matriculating student in the 1996-1997 class,
 
 id.,
 
 although it must be noted that plaintiff took the MCAT examination without the benefit of double time.
 

 [14]
 

 . Plaintiff also argues that defendants violated 34 C.F.R. § 104.7(b), which requires entities covered by the Rehabilitation Act to "adopt grievance procedures that incorporate appropriate due process standards and that provide for the prompt and equitable resolution of complaints alleging any action prohibited by this part.”
 
 Id.
 
 It is impossible to resolve this claim without further factual development. No evidence has been presented by plaintiff to prove the negative (i.e., that defendants have no such procedure), and plaintiff does not explain why the right of appeal (to Dean Carey) given plaintiff did not satisfy the requirement for a grievance procedure. Nor does plaintiff present any valid argument that any further grievance procedure would have changed the University's current position. For purposes of demonstrating success on the merits, plaintiff has not met his burden. Defendants do not address plaintiff's claim under the Rehabilitation Act regulations, understandably so, given that plaintiff served his motion on them in the late afternoon before the morning of the preliminary injunction hearing.
 

 [15]
 

 . This standard clearly comports with
 
 Horowitz,
 
 which explained that
 

 [t]he decision to dismiss ... [the student] rested on the academic judgment of school officials that she did not have the necessary clinical ability to perform adequately as a medical doctor and was making insufficient progress toward that goal. Such a judgment is by its nature more subjective and evaluative than the typical factual questions presented in the average disciplinaiy decision. Like the decision of ah individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adaptable to the procedural tools' of judicial or administrative decisionmaking.
 

 435 U.S. at 89-90,.98 S.Ct. at 955.